May it please the Court. My name is Yonatan Browdy, and I represent the appellant, Mr. Michael Hedlund. I would like to reserve two minutes of my time for rebuttal. Will you keep your voice up a little, please? Yes, Your Honor. We submit that the Bankruptcy Court correctly concluded that Mr. Hedlund was entitled to a partial discharge of his law school student loans because paying the debt in full would impose an undue hardship on Mr. Hedlund and his family under Section 523A8 of the Federal Bankruptcy Code. Mr. Browdy, I wonder if I could ask you a couple of questions that will help me understand. The bankruptcy judge actually increased the amount that your client would have to pay over what the initial now-deceased bankruptcy judge had concluded. Are you not contesting that change? Are you agreeing that if, in fact, there is a discharge, that the discharge would be at the level that the second bankruptcy judge, Judge Radcliffe, proposed? Yes, Your Honor. Judge Grant proposed. Oh, I'm sorry. Radcliffe is the one that passed away, right? Correct. Okay. The second question I have is this. At least as I look at it, the real issue here is what's the standard of review? And whichever standard we pick, Judge Brandt, pursuant to the agreement of the parties, did not hold a new hearing. He simply reviewed the record much like we would on appeal. So he had no opportunity to observe the demeanor of witnesses, to take his own measure as a human being of how truthful people were being. Does that fact have any bearing on the standard of review that we should consider in this case? No, Your Honor. I submit it does not. And the reason why is because there are two reasons, according to the McConney and the Fichter decisions by this Court, that clear error review applies to essentially factual questions. The first reason, the one that you just cited, is that the trial court, the bankruptcy court judge, is present and is able to evaluate demeanor. The second justification is one of judicial efficiencies. Good faith, for example, is a very fluid inquiry, a squishy inquiry. And factually based. And factually based, exactly. So if an appellate court were to review a good faith finding de novo, anew, that would be a great waste, a great expenditure of judicial resources. Why is that? Yes, Your Honor. Well, why is that? I mean, arguendo. Let's say for a minute that we were doing de novo review as opposed to clear error review. We all look at the same transcript. We look at the materials the same way. What's the difference in terms of judicial efficiency? I understand the burden and what a change it is, what deference we give to the findings of the bankruptcy judge. But in terms of judicial efficiency, why is it any more efficient to review a cold record for clear error as opposed to de novo review? Well, let's take good faith, for example. It's quite a subjective inquiry. Many factors go into whether someone acted in good faith. Right. And to do justice to a good faith determination on de novo would require an extensive amount of time. Any more than clear error review? I mean, I read what was said. I read what the bankruptcy judge originally said. I read what the second bankruptcy judge said. I read what the district court said. I could not have reviewed any more materials that I'm aware of regardless of the standard of review. So where's the judicial efficiency? Your Honor, this is a rule of efficiency that would apply to hundreds and hundreds of bankruptcy cases. And in every case, this Court reviews a bankruptcy court's good faith determination for clear error. So perhaps this case has a shorter record and a shorter transcript. But if we start carving out of the bankruptcy code, bankruptcy court cases, certain cases will do de novo, others clear error, depending on the minute procedural posture of the case. Then we start chipping away at that bedrock rule of efficiency. So it's the big picture you're asking us to look at, not necessarily this case. Correct. I would submit that because any totality of the circumstances test is quite fact-specific and it would take more time to comb the record for all of the nuances. And the bankruptcy court did exactly that. Well, okay. Now, I think that besides the standard of review, which I agree with Judge Smith, that's an important issue in this case because it's contested. But whatever the standard of review is, I think the important substantive question is it comes down to only one of the bruner factors, and that's good faith, right? Because that's the one that was challenged by the district court, reversed by the district court. The other is the district court didn't disturb. And as far as I can tell, a PHEAA doesn't contest on appeal. So whatever the standard or whichever the standard of review, why should we affirm, well, question this, should we affirm the bankruptcy judge's determination that Hedlund met the good faith requirement or affirm the Judge Aiken's view that he didn't meet the good faith test, right? Yes, Your Honor. We submit that whether this Court applies clear error review, which we believe should be applied, or de novo review, this Court should affirm the bankruptcy court's determination that Mr. Hedlund acted in good faith. PHEAA's argument essentially is that good faith requires that Mr. Hedlund keep on banging his head against the wall until he passes the bar, or that good faith requires that he accept PHEAA's unreasonable and unaffordable offers that would impose an undue hardship on him. That is simply not the case. The key drivers of good faith are a debtor's efforts to obtain employment, maximize income, and minimize expenses. That's the Mason decision. There are also two nondispositive factors, including a debtor's efforts to negotiate a repayment plan and whether the debtor has made any payments on the loans. We believe that we have fulfilled those as well. Along that line, there is some dispute in the cases about whether when someone's voluntary payment or whether that's confiscatory as a legal process. How should we view that in this case? Because as I understand it, there were four years before Hedlund filed for bankruptcy, and he had 16 1⁄2 months of garnishments that he did not contest. How should we weigh that? Is that he didn't have any choice, or on the other hand, should we view that since he didn't contest it that it was voluntary? Your Honor, we submit that the — that you should weigh it as voluntary. You should consider it voluntary. Because Mr. Hedlund could have stopped the garnishments at any time. How? He could have run to bankruptcy court, filed Chapter 7, and said, I can't afford any of this, end the garnishments immediately. He did not do that. And if you look at the record, he says — Well, couldn't he have filed an affidavit? Does Oregon have that system that if you come in and you file an affidavit showing that you need the funds that have been garnished for living expenses that half the funds are released? Does Oregon have a law like that? I do not know the answer to that question, Your Honor. But I do believe that there would be — would have been multiple paths for Mr. Hedlund to challenge those garnishments. As you point out, if there is such a rule in Oregon, then perhaps there's an administered procedure apart from — apart from filing Chapter 7. So I do submit that those were voluntary payments. Every court opinion that I've seen that has looked at this has viewed such payments as voluntary and has credited it. Well, they're not all that way. At least credited the debtor for those payments. Moreover, when Mr. Hedlund received the $5,000 inheritance when his grandmother passed away, he submitted all of that to his lenders. He didn't keep that money. And $1,000 of it went to FEA, to P-H-E-A-A. So Mr. Hedlund has a substantial history of payments over $5,200. I submit that no debtor, that any — every debtor that has appeared before this Court and gotten an undue hardship discharge, I don't think there's one that has made more payments in absolute terms than Mr. Hedlund. Look at the penias. They filed Chapter 7 very quickly and didn't make substantial payments. So here we have a debtor who has actually made substantial payments that he could have stopped paying, and I think that shows good faith. And it's even a nondispositive factor. There are other facts that show that Mr. Hedlund filed good faith. And remember that he only filed for — he only filed for bankruptcy when his — when his banking account was cleaned out. He believed that FEA was entitled to the money. He could afford to pay $258 a month. So he let it go. But he filed for bankruptcy when he and his family had no means left for their support. And Mr. Hedlund did try to negotiate lower payments with FEA, but FEA turned his offers down. FEA refused to consolidate his loans when he asked to consolidate. FEA only gave him options he could not afford, and he insisted on full repayment. Now, that was — that was the one that was made — perhaps I'm mistaken on the timing, but there was — there were some discussions that occurred just prior to the bankruptcy hearing the first time. Are those the ones to which you're making reference, or are you referring to his attempts? I looked online, as I recall, to see whether he was eligible. He concluded he was not. Is that what you're referring to? I'm referring to multiple things, and I'll break it down for you, Justice Kennedy. Okay. So first, Mr. Hedlund, he sought forbearances and extensions, and he got those. Then Mr. Hedlund attempted to consolidate his loans because he thought he might be able to afford them if he had a lower payment plan. But he was stymied by a lost application. Consolidate — attempt to consolidate is another factor. Does the lender concede that the application was lost? Your Honor. Or is that just his allegation? It's conceded in the sense that it was uncontroverted at trial.  So nobody can controvert. Okay. The other offer to which I'm referring is Mr. Hedlund said to FIA, I'll give you $5,000 in exchange for a negotiation of better payment terms so I can make payments and afford them. This was going to be a loan from his father or his grandfather or somebody. That is correct, Your Honor, if FIA was willing to renegotiate the payment terms, but they were not. What did they say in response? Did they say, okay, we'll let you go on some graduated plan? Absolutely not. They said pay us $10,000 now and $1,300 for the next 10 months, and then we'll consider giving you an affordable payment plan. Or pay us $80,000 right now. Those were clearly not affordable options. One of the factors that district court held against Mr. Hedlund was that she didn't think that his efforts to negotiate an ICRP plan went very far, right? And definitely the opinion that, well, he could have done more on that front. Judge, see, I have a few responses to that. First, Mr. Hedlund did investigate the ICRP and concluded that he was ineligible because he was in default. Can you speak a little slower? Yes, Your Honor. I apologize. He investigated the ICRP, and he concluded that he could not he was he could not apply for it because he was in default, because his loans had defaulted, because FIAT lost his application for consolidation. He had a lot of, you know, he didn't pass the bar. So in evaluating his personal determination that he was ineligible, how much should we credit his legal education and his ability to make that determination? Well, in good faith analysis, a variety of factors are considered, and that could be one, that here's a sophisticated, relatively sophisticated man who has a BA and a JD, and he likely could make a good call. His father is an attorney, and is his grandfather an attorney or an uncle or something? Brother. His father and brother are attorneys. So does anything in the record indicate he consulted with them about this issue? No, there are no facts in the record on that. Okay. The other point that I'd make on the ICRP, Your Honor, is that even if he were He was not eligible. And FIA waived in 2003. I'd like to point out FIA waived in 2003 and 2010 any argument about his eligibility for the ICRP. FIA in 2003 said in closing argument that the ICRP was just, quote, not that relevant. And there I'm referring to excerpts of Record 320, because so they, as I said, it's not that relevant because we presented other repayment options. And the second point that I'd like to make is even if he were eligible for the ICRP, those payments FIA conceded would have been more than he could have afforded. If you take a look at excerpts of Record 320, that's what FIA says. They say the ICRP plans would be about $400 or so. He could only afford. Do you want to save any time? Yes, Your Honor. If you want to. It's up to you. He could only afford to pay $240 a month was the bankruptcy court's determination. I will come back for rebuttal. Good morning, counsel. May it please the Court. My name is Daniel Steinberg. I'm here on behalf of the Pennsylvania Higher Education Assistance Agency, FIA, or what I'll refer to as the lender in this case, just for brevity purposes. We're here today because of the appeal from the Honorable Judge.  I'm here on behalf of the Pennsylvania Higher Education Assistance Agency, FIA. I'm here on behalf of the Honorable Judge Aiken, wherein she determined that the debtor did not sustain the debtor's burden in meeting the third prong of the Brunner test. In doing so, she relied on… Well, here the bankruptcy court found that he lived frugally, but he couldn't afford to pay the loans, and that this financial problem would persist into the future, and that he had acted in good faith. Both bankruptcy courts found that, right? Both bankruptcy courts found that. All right? And now, this at one time went to the BAP, but the second time around, it was heard by the district court. That's right. And now, the district court, when it came before that court the second time around, upheld the first two findings, but reversed the bankruptcy court on the good faith finding. That's right. And then the district judge reinstated the full amount of the debt. And the effect of what the bankruptcy court did was to reduce the obligation by 55,000. Is that what happened? And then 30,000 was left. A little more than that. That's right. 32,000. After the second judge revisited it. Yes. Okay. And I'm just curious. Is that being paid off? Not a single voluntary payment has been made from the debtor's wages in the entirety of this case. The only voluntary payment was one that was made from the inheritance he received. Excuse me, counsel. I gather by your statement that you construe the money that was garnished as not being voluntary, right? I did. Because clearly, there was at least 16 months' worth of garnishment taken out. Is that right? That's right. And that was out of wages. I'm sorry? That came out of his wages. It did. It was a wage garnishment, but it wasn't a voluntary payment. Okay. And to address the judge. Well, again, that's your take on it. Yes. Would you agree that there are cases both in our circuit and elsewhere that construe garnishments otherwise? They give credit to the debtor as allowing the garnishment or that at least those payments should be credited that they weren't challenged. Okay. To address Judge Preggerson's question earlier, Oregon administrative rules allow challenges to garnishments on very narrow grounds, only that the property is either exempt or that the property is or that the debt has been miscalculated. And that's ORS Chapter 18. The debtor and the record is devoid of any record of the debtor having any legal challenge to the garnishments. So to say he allowed it is sort of a misnomer. Oregon has very limited challenges to garnishments. He could have filed a bankruptcy, and he did. But that's the only way that he could have stopped the garnishments in this case. He did that after four years, right? Sixteen months. He did it six years after law school. Yeah, right. Six years after law school and after 16 months of garnishments. I have a question for you, Mr. Steinberg. As I look at it, I'm interested in your view on it. Are In re Nye's, In re Pena, In re Mason, and with Bahrain being distinguishable, it seems like our standard of review is clear error. Why is that wrong? We don't think it is. Do you agree that clear error is the standard? It's both. It's de novo review for the legal conclusion that a new hardship has been met. And it's clear error for factual determinations. For instance, he took the bar twice. Wait, wait, wait, wait. Help me with this. Sure. Okay, so you agree that clear error is the standard of review for factual issues. No question. De novo for legal issues, right? Absolutely. Okay, so in this particular case, Judge Brand reviewed the facts, concluded that there was good faith. We're just going to focus on that prong of Bruner because that's really the only one that's at issue here. So those are factual determinations. Wherein does a legal determination come in? Well, there's a question as to I think whether the good faith determination based on the facts is in fact a legal or a factual determination. Well, let's look at it this way. Judge Aiken very clearly said, I can quote you if you want. No, I understand. She said that she was reviewing de novo, everything. Well, earlier in the opinion, she said she reviews the factual determinations for clear error, but she does say that she's making a de novo review on whether good faith was met. Okay, but whether there's good faith is, you know, you look at the facts. She apparently did the de novo. So if, arguendo, if what we're talking about here is what are the facts? When we look at what the bankruptcy judge did, are we to look at that in terms of is it, was his argument a reasonable argument? Is this much one way or the other way? In other words, how much deference does this court owe to Judge Branch's determination? It's interesting the question you asked earlier based on the unique procedural posture here. Because of Judge Radcliffe's untimely death, it does create a unique situation because he had no better review than this court or Judge Aiken had in reviewing the record. Let's assume, just arguendo, let's assume that Judge Radcliffe, God rest his soul, had not died. And we were sending this back to him for his determination. Would that change the posture of this case from the lender's perspective? I don't think it changes the posture. If the determinations had come out the same, I think we would still be here making the same argument and that even under clear error, this case, Judge Aiken got it right. Okay. So from your perspective, even if we, in quotes, agree, in quotes, that Judge Branch, his review of the facts was not clear error, you're saying that on a de novo basis, that applying those facts to the law, that somehow we have a transfiguration, transmogrification or whatever, of these facts that change the outcome. How does that work? I think that, and I'm not sure if I understood your question correctly, but I think that under either a clear error standard or a de novo standard, Judge Brant got it wrong and Judge Aiken got it right. See, that's what I'm struggling with, counsel, and I hope you can help me, is that my understanding of the clear error issue is, and I'm going to read this to you if I can find this, a definition of what, here it is, this is from the Supreme Court. Finding is clearly erroneous when, although there is evidence to support it, the reviewing court of the entire evidence is left with a definite and firm conviction that a mistake has been committed. This standard plainly does not entitle the reviewing court to reverse the finding of the trier of facts simply because it is convinced that it would have decided the case differently. So basically, as I understand this, this is Anderson v. City of Bessemer. If we say hypothetically that we thought, well, I don't know, this is a real close case, we would probably have done it differently, that under clear error review, when we look at the whole picture, unless we come away with a conviction that Judge Brant just blew it, we've got to defer to his findings. Where am I wrong? Under a clear error analysis, I think that's right. Okay. So if we conclude that our case law and the law of the Supreme Court requires us to review Judge Brant's decision for clear error, then at least insofar as the factual aspect is concerned, you agree that unless we just think, boy, how did he come up with that, we're basically bound by his determination as to the facts. As to the facts, I agree. Both your law and the Supreme Court have said that clearly. Okay. So go ahead. There was a hearing for the first judge. There was before Judge Radcliffe in 2003. And what were his – what was his conclusion? His conclusion was that the debtor met all three prongs. He had reservations about the good faith requirement, but he determined that the debtor was entitled to a partial discharge and discharge all but about $30,000 of the debt. So if we apply clear error, then the – we uphold his ruling. As modified by Judge Brant. It's gone – Judge Brant didn't have a hearing, did he? He had a hearing, but he didn't hear evidence. He had basically an argument. An argument. Right. He didn't have an opportunity to judge the credibility of this debtor or didn't have a live person there that was testifying. No. He didn't have that. So he really – he just looked at the papers and he basically came to the same conclusion. He did. Yeah. And so why isn't – why is that the end of it? The problem here is no one is disputing a single fact. This isn't a case where the credibility of a witness is dispositive. This isn't a case where we're saying – Well, how do we know that? Because we can see that on appeal to the district court. Well, how do we know that the credibility of the witness or the impression that the witness made, what the witness has gone through, his problems with the bar and getting married and having a child and all the rest of it, how do we know that somehow that didn't have an effect on the bankruptcy judge's credibility determination? Here's how we know that. If it did, it was clear error. So it really doesn't matter. Why was it clear error? Because the emotion and the sympathies of the court, as cases have held, don't play into the undue hardship. The factors that are considered are set forth. And we don't dispute a single factual designation on the record. What we dispute is that when those facts are applied to the law, that this case is clear. And you agree that the application was lost by your client? If it was, as the debtor concedes, it was made at the last minute. Whatever it was, they lost it. It was lost. It's unclear whether it was lost by us or in the mail. That's not the allegation is that we lost it. It was lost is the allegation in the record. The point here is that this case is shockingly like Mason. And that's what Judge Aiken found. Shockingly like this court's prior ruling in Mason. The debtor here is virtually identical to the debtor in Mason. They were both 33 at the time of the bankruptcy. They both graduated law school in the late 90s in the Pacific Northwest. They both had trouble passing the bar. The difference is the Mason debtor was more sympathetic. The Mason debtor had a history of voluntary payments on the loan. Well, wait a minute. I'm not sure I read Mason the same way you do. I'm not sure its author would either, but we'll see. As I understand it in Mason, he worked only part-time as a home siding installer despite having a bachelor's degree and a law degree. He argued that working full-time or finding a second job would interfere with his search for a full-time position. Whereas here, he only tried to take the bar once. Here you've got somebody who tried to take the bar four times. Admittedly, the fourth time was an auto issue, but three times, okay. He got a full-time job. Everybody seems to concede that in Klamath Falls, it's about as good a job as he's going to get. He's got sympathetic in-laws, and his wife is now working part-time and part because of the bankruptcy judge. Admittedly, this is fact specific, but I'm not sure that Mason is anywhere close to being on all fours. Is that your best case, Mason? Mason is the best case because here's what we've got. In Mason's category, we have three things in Mason's favor going towards dischargeability that are missing here. Voluntary payments, a learning disability that he's had since grade school which affected his abilities, and a history of negotiations which are all set forth in between the BAP opinion and this court's opinion. In this case, he has two factors in his favor, the headline does, that weren't present in Mason. Full-time employment, although the co-debtor's spouse was underemployed, which is why Judge Grant raised the minimum amount. And the fact that he took the bar one extra time, which they say is a distinguishing factor, and we disagree. But the point here is we focus on the other prongs of the matter, which is the negotiations. And here, after Judge Grant increased the amount to 465, the debtor could have afforded any of the payment plans put forth by PHEA, which he rejected, and still he hasn't made a payment on it. And for those reasons, we believe Judge Aiken got it correct and should be referred. Thank you. Thank you, Your Honor. I'd like to make a few quick points. First, PHEA just made a misstatement. The Judge Grant's final determination was that Mr. Hedlund could only afford to pay $240 a month. The $460 figure does not include the adjustment, which was within Judge Grant's reasonable discretion, for the fact that the Hedlunds needed to move to a bigger apartment. Under Ninth Circuit precedent, a bankruptcy judge is allowed to make such adjustments. That's because of the child, right? That is correct, Your Honor, and they were expecting more children. The next point that I'd like to make concerns your colloquy with my opponent regarding clear-error review. So the clear-error review standard applies to two kinds of factual determinations. First, the basic facts that the Bankruptcy Court finds, but additionally to each Bruner prong, because each Bruner prong is an essentially factual question. And this is borne out by unequivocal language in the Mason decision, the Pena decision, and the Ruffino decision where clear error is applied. The other thing that I'd like to point out is I'd like to see your saying good faith is a factual question. That is correct. I'm saying good faith is a factual question. You answered and you said yes. Yes. The other thing that I'd like to point out, Your Honor, is regarding our colloquy about the policy rationales for clear-error review, I made the case about judicial efficiency, but I'd also like to make the case about this first fact. We've talked about the transcript. It's just review. Well, if we're going to be efficient, we'd have cut you off 37 seconds. I apologize. In any event, may I finish my comment? Yes. But be efficient. Okay. In the Fitcher decision, this Court said that bankruptcy judges have informed practical experience in dealing with the bankrupt and their creditors. So even if there are no credibility issues, et cetera, there's still Judge Brand's expertise. So we submit that this Court should affirm the bankruptcy court's decision. Thank you very much. All right.
judges: Pregerson, Tashima, Smith